CHASE MANHATTAN BANK, TRUSTEE, ET AL. *v.*
GENE GAVIN, COMMISSIONER OF
REVENUE SERVICES
(SC 15875)

Callahan, C. J., and Borden, Berdon, Norcott, Palmer, McDonald and Peters, Js.

Argued October 27, 1998—officially released June 1, 1999

*Philip H. Schaeffer*, with whom were *Constance L. Epstein* and, on the brief, *Andrew S. Auchincloss* and *Edward F. Rover*, for the appellants (plaintiffs).

*Richard K. Greenberg*, assistant attorney general, with whom were *John G. Haines*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Opinion*

BORDEN, J. The issues in this appeal are whether Connecticut's tax on the undistributed taxable income of four testamentary trusts and one inter vivos trust: (1) violates the due process clause of the fourteenth amendment to the United States constitution;[1] and (2) unduly burdens interstate commerce in violation of the commerce clause of the United States constitution.[2] The named plaintiff, Chase Manhattan Bank, and the plaintiff cotrustees (plaintiff),[3] appeal from the summary judgment of the trial court in favor of the defendant, Gene Gavin, the commissioner of revenue

---

[1] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law . . . ."

[2] The constitution of the United States, article one, § 8, provides in relevant part: "The Congress shall have Power . . . [t]o regulate Commerce . . . among the Several States . . . ."

[3] Chase Manhattan Bank is the successor trustee to Manufacturers Hanover Trust Company, Chemical Bank and Central Hanover Bank for the various trusts involved in this case. The other plaintiffs in this appeal are cotrustees with Chase Manhattan Bank for two of the testamentary trusts: (1) Elizabeth B. Parry and Harrison F. Durand are cotrustees of the Parry Trust; and (2) Bernard L. Pacella is cotrustee of the Dallett Trust. Chase Manhattan Bank is the sole trustee of the remaining two testamentary trusts, namely, the Stewart Trust and the Worcester Trust, and of the inter vivos trust, namely, the Adolfsson Trust. Although Chemical Bank was the corporate trustee for the tax year in question and initially brought this action, in

services.[4] By that judgment, the trial court rejected the plaintiff's requests for refunds of the 1993 income taxes paid by the plaintiff as trustee of the trusts. The plaintiff claims that the relevant taxation scheme, as applied to it, violates the due process clause and commerce clause of the federal constitution. We affirm the judgment of the trial court.

After paying the 1993 income taxes imposed on the trusts in question, the plaintiff requested refunds from the defendant, who denied the requests. The plaintiff appealed from the denials to the trial court pursuant to General Statutes § 12-730.[5] In the trial court, the parties stipulated to the facts, submitted uncontroverted affidavits, and filed cross motions for summary judgment. The court granted the defendant's motion for summary judgment, denied the plaintiff's motion, and rendered judgment for the defendant. This appeal followed.

The facts are undisputed. The plaintiff, a banking corporation incorporated under the laws of New York, is the trustee of the four testamentary trusts, namely, the Parry Trust, the Dallett Trust, the Stewart Trust and the Worcester Trust, and of the single inter vivos trust, namely, the Adolfsson Trust. All of the trusts are resident trusts as defined by General Statutes § 12-701 (a)

1996 it merged with Chase Manhattan Bank and the name of the surviving corporation was changed from Chemical Bank to Chase Manhattan Bank. Hereafter, we refer to Chase Manhattan Bank and the individual cotrustees collectively as the plaintiff.

[4] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now § 65-1, and General Statutes § 51-199 (c).

[5] General Statutes § 12-730 provides in relevant part: "Notwithstanding the provisions of chapter 54 to the contrary, any taxpayer aggrieved because of any determination or disallowance by the commissioner under section 12-729 or 12-732 may, within one month after notice of the commissioner's determination or disallowance is mailed to the taxpayer, take an appeal therefrom to the superior court for the judicial district of Hartford . . . ."

(4).[6] Each testamentary trust is "a trust . . . consisting of property transferred by will of a decedent who at the time of his death was a resident of this state";[7] General Statutes § 12-701 (a) (4) (C); and the inter vivos trust is "a trust . . . consisting of the property of . . .

---

[6] General Statutes § 12-701 (a) (4) provides: " 'Resident trust or estate' means (A) the estate of a decedent who at the time of his death was a resident of this state, (B) the estate of a person who, at the time of commencement of a case under Title 11 of the United States Code, was a resident of this state, (C) a trust, or a portion of a trust, consisting of property transferred by will of a decedent who at the time of his death was a resident of this state, and (D) a trust, or a portion of a trust, consisting of the property of (i) a person who was a resident of this state at the time the property was transferred to the trust if the trust was then irrevocable, (ii) a person who, if the trust was revocable at the time the property was transferred to the trust, and has not subsequently become irrevocable, was a resident of this state at the time the property was transferred to the trust or (iii) a person who, if the trust was revocable when the property was transferred to the trust but the trust has subsequently become irrevocable, was a resident of this state at the time the trust became irrevocable. For purposes of this chapter, if any trust or portion of a trust, other than a trust created by the will of a decedent, has one or more nonresident noncontingent beneficiaries, the Connecticut taxable income of the trust, as defined in subdivision (9) of this subsection, shall be modified as follows: The Connecticut taxable income of the trust shall be the sum of all such income derived from or connected with sources within this state and that portion of such income derived from or connected with all other sources which is derived by applying to all such income derived from or connected with all other sources a fraction the numerator of which is the number of resident noncontingent beneficiaries and the denominator of which is the total number of noncontingent beneficiaries. For purposes of section 12-700a, if any trust or portion of a trust, other than a trust created by the will of a decedent, has one or more nonresident noncontingent beneficiaries, its adjusted federal alternative minimum taxable income, as defined in section 12-700a shall be modified as follows: The adjusted federal alternative minimum taxable income of the trust shall be the sum of all such income derived from or connected with sources within this state and that portion of such income derived from or connected with all other sources which is derived by applying to all such income derived from or connected with all other sources a fraction, the numerator of which is the number of resident noncontingent beneficiaries and the denominator of which is the total number of noncontingent beneficiaries. As used in this subdivision, 'noncontingent beneficiary' means a beneficiary whose interest is not subject to a condition precedent."

[7] For purposes of chapter 229 of the General Statutes, the income tax provisions, § 12-701 (a) (1), with certain exceptions not relevant here, pro-

a person who was a resident of this state at the time the property was transferred to the trust if the trust was then irrevocable . . . ." General Statutes § 12-701 (a) (4) (D) (i); see footnote 6 of this opinion. More specifically, the Parry Trust was established in 1968 under the will of Sidney L. Parry, a Connecticut domiciliary, and was probated in the Probate Court for the district of Westport. The Dallett Trust was established in 1975 under the will of John Dallett, a Connecticut domiciliary, and was probated in the Probate Court for the district of Westport. The Stewart Trust was established in 1974 under the will of Elvira R. Evens, a Connecticut domiciliary, and was probated in the Probate Court for the district of New Canaan. The Worcester Trust was established in 1936 under the will of James N. Worcester, a Connecticut domiciliary, and was probated in the Probate Court for the district of New Canaan. The Adolfsson Trust is an irrevocable inter vivos trust established in 1955 by Charles Anderson Dana, a Connecticut domiciliary.

It is undisputed that the plaintiff, acting as trustee, did not maintain any presence and was not a domiciliary or a resident of Connecticut, and that no asset of any trust was located in Connecticut in 1993. No aspect of trust administration was conducted in Connecticut in 1993, and except for this proceeding and the probate proceedings delineated later in this opinion, the plaintiff, as trustee, has not been the subject of any judicial or administrative proceeding in any Connecticut forum. The assets of all of the trusts for 1993 consisted solely of cash and securities held in accounts of the plaintiff as trustee in New York. None of the trusts earned any income derived from or connected with the ownership

vides in relevant part: " 'Resident of this state' means any natural person . . . who is domiciled in this state . . . ." Thus, for purposes of the state income tax, the term "resident of this state" means a Connecticut domiciliary.

or disposition of any interest in real or tangible personal property, or from a business, trade, profession or occupation carried on by the trust in Connecticut or elsewhere. None of the four testamentary trusts paid any income taxes to any other state for 1993. The stipulation is silent on this point regarding the inter vivos trust.

None of the beneficiaries of the Parry Trust or the Dallett Trust was, or has been since its establishment, a resident or a domiciliary of Connecticut. The current income beneficiary of the Parry Trust is Elizabeth B. Parry. The trustee has the discretion to distribute principal to her, and up to 50 percent of the income to the testator's grandchildren. Upon the death of Elizabeth B. Parry, Elizabeth Parry Miller will become the beneficiary and, upon her death, the trust will terminate and the trust assets will be distributed to the testator's then living issue. The current income beneficiary of the Dallett Trust is John Dallett, Jr. The trustee has discretion to distribute the principal to him. Upon his death, the trust will terminate and the trust assets will be distributed to Cassandra Dallett. With respect to the Stewart Trust, since its establishment in 1974, Grace Evens Stewart, a Connecticut domiciliary, was the income and discretionary principal beneficiary until her death in 1995, when the trust was terminated and the trust property was distributed to her two children, one of whom was a Connecticut resident. With respect to the Worcester Trust, the current income beneficiary is, and was during 1993, James N. Worcester, Jr., a Connecticut domiciliary, and upon his death the trust property will be distributed either by virtue of his exercise of a general testamentary power of appointment or, in default of such an appointment, to his four children, one of whom is currently a Connecticut domiciliary. With respect to the Adolfsson Trust, the sole current income beneficiary is, and was in 1993, Sandra Leigh Dana, a

Connecticut domiciliary.[8] In 1993, she was thirty-nine years old. The trust will terminate upon her death or when she reaches the age of forty-eight, when the trust property will be distributed to her outright if she is then living or, if not, pursuant either to her testamentary power of appointment or to her then living descendants, who are currently her children living with her in Connecticut.

Under the terms of the Parry Trust, the plaintiff is excused from rendering periodic accounts to the Probate Court pursuant to General Statutes § 45a-177[9] and,

[8] The stipulation provides that under the terms of the trust agreement, "the Trustee is directed to distribute all income to beneficiary Sandra Leigh Dana . . . in quarterly installments . . . ." Nonetheless, there was, with respect to this trust and to the other two trusts that had Connecticut domiciliary beneficiaries in 1993, undistributed taxable income. The plaintiff states in its brief, without contradiction by the defendant: "For the three trusts herein that had beneficiaries in Connecticut in 1993, none of the beneficiaries had any present right or control over the portion of the trusts that were generating income subject to Connecticut's tax. In each case, Connecticut only assessed an income tax upon realized capital gains and accumulated income that were not distributed to any beneficiary in 1993." The plaintiff does not dispute, moreover, that the Connecticut beneficiaries are taxable on the income that they receive from the trusts.

[9] General Statutes § 45a-177 provides: "(a) All conservators, guardians, persons appointed by the Court of Probate to sell land of minors and trustees, including those entrusted with testamentary trusts unless excused by the will creating the trust, shall render periodic accounts of their trusts under oath to the Court of Probate having jurisdiction for allowance, at least once during each three-year period and more frequently if required to do so by the will or trust instrument creating the trust. Periodic accounts for filing only may be submitted to the court at any time during each three-year period. Upon receipt of a periodic account, the court shall cause notice of it and of its availability for examination at the court to be given in such manner and to such parties as it deems reasonable. Any such party may apply to the court for a hearing on the account. If an application for such a hearing is not received by the court from a party in interest within the time stated in the notice, the periodic account will be filed without hearing thereon and without allowance or disallowance thereof, and shall not be recorded. At the end of each three-year period from the date of the last allowance of a periodic account, or upon the earlier receipt of a final account, there shall be a hearing on all periodic accounts not previously allowed, and the final account, if any, in accordance with sections 45a-178 and 45a-179.

accordingly, the plaintiff has not rendered any such periodic accounts. Thus, the plaintiff has been involved in probate proceedings only with respect to the probating of the testator's will. Under the terms of the Stewart Trust, the plaintiff is excused from rendering periodic accounts to the Probate Court pursuant to § 45a-177; see footnote 9 of this opinion; and, accordingly, the plaintiff has not filed any such periodic accounts. At the termination of the trust in 1995, however, the plaintiff filed a first and final account for the period 1975 through 1995, which the Probate Court approved in February, 1996. With respect to the Dallett Trust, the plaintiff has filed six periodic accounts in the Probate Court for the periods 1976–79, 1979–82, 1982–85, 1985–88, 1988–91 and 1991–93, all of which the Probate Court approved. With respect to the Worcester Trust, the plaintiff has filed forty-one periodic accounts in the Probate Court, from 1937 through 1995, all of which the Probate Court approved. With respect to the Adolfsson Trust, the plaintiff has appeared in a Connecticut court only in connection with this tax appeal.

Before considering the merits of the plaintiff's claims, it is useful to discuss the application of the relevant tax statutes to the resident testamentary trusts and the inter vivos trust in this case. For the 1993 tax year, General Statutes § 12-700 (a)[10] imposed a tax on "the

"(b) Each such periodic account shall include an inventory of the trust estate showing fully how the principal of the fund is invested and the items of income and expenditure. If there has been no change in the identity of the items comprising the principal of the fund since the last account which has been accepted and approved, it shall not be necessary to include an inventory of the trust estate.

"(c) If the estate held by any person in any such fiduciary capacity is less than two thousand dollars, or, in the case of a corporate fiduciary under the supervision of the Commissioner of Banking or any other fiduciary bonded by a surety company authorized to do business in this state, ten thousand dollars, he shall not be required to render such account unless so ordered by the court."

[10] General Statutes § 12-700 (a) provides in relevant part: "There is hereby imposed on the Connecticut taxable income of each resident of this state a tax:

Connecticut taxable income" of all residents of the state, including trusts and estates. Under General Statutes § 12-701 (a) (9),[11] the " 'Connecticut taxable income of a resident trust or estate' shall mean the taxable income of the fiduciary of such trust or estate as determined for purposes of the federal income tax," subject to certain adjustments not relevant here. Under § 12-701 (a) (4) (C), a resident testamentary trust is "a trust, or a portion of a trust, consisting of property transferred by will of a decedent who at the time of his death was a resident of this state . . . ." Thus, all of the testamentary trusts in this case were resident trusts, and all of their 1993 undistributed taxable income statutorily was taxable in Connecticut.

The statutory taxation scheme of an inter vivos trust, however, is somewhat different and more complicated. Under § 12-701 (a) (4) (D), a resident inter vivos trust is "a trust, or a portion of a trust, consisting of the property of (i) a person who was a resident of this state at the time the property was transferred to the trust if the trust was then irrevocable . . . ." An inter vivos trust's taxable income for federal income taxes is considered—again, subject to certain adjustments not relevant here—to be its "Connecticut taxable income."

---

"(1) At the rate of four and one-half per cent of such Connecticut taxable income for taxable years commencing on or after January 1, 1992, and prior to January 1, 1996.

"(2) For taxable years commencing on or after January 1, 1996, but prior to January 1, 1997, in accordance with the following schedule . . .

"(D) For trusts or estates, the rate of tax shall be 4.5% of their Connecticut taxable income. . . ."

[11] General Statutes § 12-701 provides in relevant part: "(a) For purposes of this chapter . . .

"(9) 'Connecticut taxable income of a resident trust or estate' shall mean the taxable income of the fiduciary of such trust or estate as determined for purposes of the federal income tax, to which (A) there shall be added or subtracted, as the case may be, the share of the trust or estate, as determined under section 12-716, in the Connecticut fiduciary adjustment and (B) with respect to any trust, there shall be added the amount of any includable gain, reduced by any deductions properly allocable thereto, upon

General Statutes § 12-701 (a) (9). This taxable income is modifiable, however, according to a formula that takes into account whether there is any resident non-contingent beneficiary of the trust.[12] Under the formula set forth in § 12-701 (a) (4),[13] if there are no nonresident noncontingent beneficiaries, there is no modification. If, however, there are nonresident noncontingent beneficiaries then, as the defendant explains: "[T]he income simply would be prorated and assigned to this State based upon the ratio of Connecticut noncontingent beneficiaries to all noncontingent beneficiaries. Thus, unlike testamentary trusts, inter vivos trusts are taxed only on that portion of the undistributed income which corresponds to the number of in-state [noncontingent] beneficiaries." In the present case, therefore, the Adolfsson Trust is a resident inter vivos trust and,

which a tax is imposed for the taxable year pursuant to Section 644 of the Internal Revenue Code. . . ."

[12] Section 12-701 (a) (4) defines a "noncontingent beneficiary" as "a beneficiary whose interest is not subject to a condition precedent." The regulations of the department of revenue services further defines a "noncontingent beneficiary" as "every beneficiary whose interest is not subject to a condition precedent and includes every individual to whom a trustee of nontestamentary trust during the taxable year (i) is required to distribute currently income or corpus (or both) or (ii) properly pays or credits income or corpus (or both) or (iii) may, in the trustee's discretion, distribute income or corpus (or both). 'Noncontingent beneficiary' includes every beneficiary to whom or whose estate any of the trust's income for the taxable year is required to be distributed at a specified future date or event and every beneficiary who has the unrestricted lifetime or testamentary power, exercisable currently or at some future specified date or event, to withdraw any of the trust's income for the taxable year or to appoint such income to any person, including the estate of such beneficiary. . . ." Regs., Conn. State Agencies § 12-701 (a) (9)-1 (b) (3).

[13] General Statutes § 12-701 (a) (4) provides in relevant part: "The Connecticut taxable income of the trust shall be the sum of all such income derived from or connected with sources within this state and that portion of such income derived from or connected with all other sources which is derived by applying to all such income derived from or connected with all other sources a fraction the numerator of which is the number of resident noncontingent beneficiaries and the denominator of which is the total number of noncontingent beneficiaries. . . ."

because its only noncontingent beneficiary is a Connecticut domiciliary, all of its 1993 undistributed income was taxable in Connecticut.

As is evident from this discussion, the taxability of the income of the resident testamentary trusts in this case is based on the fact that the testators were Connecticut domiciliaries at the time of their deaths. The taxability of the income of the inter vivos trust in this case is based on the fact that the settlor of the trust was a Connecticut domiciliary when the trust was established and the beneficiary is a Connecticut domiciliary. The plaintiff claims that this taxation scheme, as applied to it, violates the due process clause and the commerce clause of the federal constitution. We consider the plaintiff's contentions in turn. We conclude that none of them is persuasive.

## I

## DUE PROCESS OF LAW

### A

### The Testamentary Trusts

With respect to the testamentary trusts, the plaintiff argues that, "[f]or Connecticut's power to tax these trusts to be upheld, Connecticut must provide the trusts with contemporaneous benefits, protections and opportunities. Those in turn must be 'fiscally' relevant to the rights of the trustees to receive and enjoy *income*, and sufficient in scope to justify categorizing the trusts as *domiciliaries*. However, Connecticut did not provide the trusts with such contemporaneous benefits and protections because, for each trust, the trustees, the trust assets and administration were located outside of Connecticut's borders." (Emphasis in original.) We are not persuaded by this contention.

We begin with the observation that our task of evaluating the constitutionality of a legislative scheme of taxation is somewhat circumscribed. "A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." *Wisconsin* v. *J. C. Penney Co.*, 311 U.S. 435, 444, 61 S. Ct. 246, 85 L. Ed. 267 (1940).

"As a general principle, a State may not tax value earned outside its borders. See, e.g., *Connecticut General Life Ins. Co.* v. *Johnson*, 303 U.S. 77, 80–81 [58 S. Ct. 436, 82 L. Ed. 673] (1938). The broad inquiry in a case such as this, therefore, is 'whether the taxing power exerted by the state bears a fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return.' *Wisconsin* v. *J. C. Penney Co.*, [supra, 311 U.S. 444]." *ASARCO, Inc.* v. *Idaho State Tax Commission*, 458 U.S. 307, 315, 102 S. Ct. 3103, 73 L. Ed. 2d 787 (1982).

This "broad inquiry" has been refined further into a two part test. "For a State to tax income generated in interstate commerce, the Due Process Clause of the Fourteenth Amendment imposes two requirements: [1] a 'minimal connection' between the interstate activities and the taxing State, and [2] a rational relationship between the income attributed to the State and the intrastate values of the enterprise. *Moorman Mfg. Co.* v. *Bair*, 437 U.S. 267, [272–73, 98 S. Ct. 2340, 57 L. Ed. 2d 197] (1978); see *National Bellas Hess, Inc.* v. *Department of Revenue*, 386 U.S. 753, 756 [87 S. Ct. 1389, 18 L. Ed. 2d 505] (1967), [rev'd on other grounds, *Quill Corp.* v. *North Dakota*, 504 U.S. 298, 306, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1997)]; *Norfolk & Western R. Co.* v. *Missouri Tax Comm'n*, 390 U.S. 317, 325 [88

S. Ct. 995, 19 L. Ed. 2d 1201] (1968)." *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* 445 U.S. 425, 436–37, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980); see also *Quill Corp.* v. *North Dakota,* supra, 306 ("The Due Process Clause 'requires some definite link, some minimum connection between a state and the person, property or transaction it seeks to tax,' *Miller Brothers Co.* v. *Maryland,* 347 U.S. 340, 344–45 [74 S. Ct. 535, 98 L. Ed. 2d 744] (1954), and that the 'income attributed to the State for tax purposes must be rationally related to "values connected with the taxing state." ' *Moorman Mfg. Co.* v. *Bair,* [supra, 273].").

Neither party has focused at all on the second part of this due process test, namely, that the income attributed to the state must be rationally related to values connected with the taxing state.[14] Both parties have focused, instead, on the first part of the due process test, namely, that there be some definite link or minimum connection between the state and the person, property or transaction it seeks to tax. We confine our discussion, therefore, to that aspect of the test as it applies to the facts of the present case.

In *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 301, the United States Supreme Court confronted a due process challenge to North Dakota's imposition of a statutory duty on an out-of-state mail order house to collect

---

[14] Our brief inquiry into the second part of the test discloses that its principal application has been in cases in which a state seeks to attribute to its tax base some portion of the property or income of a multistate business enterprise that does business in the state. In such cases, the "values" to which the test refers are numerical, economic or fiscal values—property values in a broad sense; not values in a social science sense—and the cases require, in general terms, that only a fair proportion of the property or income of the total enterprise be attributed to the taxing state. See, e.g., *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* supra, 445 U.S. 425; *Moorman Mfg. Co.* v. *Bair,* supra, 437 U.S. 267; *Norfolk & Western R. Co.* v. *Missouri Tax Commission,* supra, 390 U.S. 317. Although the plaintiff in its brief mentions this part of the test in passing, we do not understand the plaintiff's arguments to rely on it.

and pay a use tax on goods purchased for use within the state. The court began its analysis by repeating the familiar two part test: "The Due Process Clause requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax, *Miller Brothers Co.* v. *Maryland*, [supra, 347 U.S. 344–45], and that the income attributed to the State for tax purposes must be rationally related to values connected with the taxing State, *Moorman Mfg. Co.* v. *Bair*, [supra, 437 U.S. 273]." (Internal quotation marks omitted.) *Quill Corp.* v. *North Dakota*, supra, 306. The court noted, moreover, that "[h]ere, we are concerned primarily with the first of these requirements." Id.

The court then employed what it termed the "[c]om-parable reasoning"; id., 308; of the due process cases in the field of "judicial jurisdiction." Id., 307. In doing so, the court "abandoned more formalistic tests that focused on a defendant's 'presence' within a State in favor of a more flexible inquiry into whether a defendant's contacts with the forum made it reasonable, in the context of our federal system of Government, to require it to defend the suit in that State." Id. Thus, the court in *Quill Corp.* v. *North Dakota*, supra, 504 U.S. 308, overruled, "as superseded by developments in the law of due process," the prior holdings in the area of sales and use taxes; see, e.g., *National Bellas Hess, Inc.* v. *Dept. of Revenue*, supra, 386 U.S. 753; that "some sort of physical presence" of the seller in the taxing state is required in order for the state to impose such a duty on the seller. *Quill Corp.* v. *North Dakota*, supra, 306–307.

In place of a physical presence of the out-of-state mail order seller, the court borrowed, from the adjudicative jurisdictional cases, the concept that such jurisdiction was valid where a foreign corporation had "purpose-fully avail[ed] itself of an economic market in the forum . . . ." Id., 307. Applying that concept, the court noted

that the seller had "engaged in continuous and wide-spread solicitation of business within [the] State." Id., 308. This activity gave the seller " 'fair warning that [its] activity [subjected it] to the [tax] jurisdiction of [the state].' " Id.; see also id., 312 ("[w]e have, therefore, often identified 'notice' or 'fair warning' as the analytic touchstone of due process nexus analysis"). In this regard, the record indicated that the seller solicited business in North Dakota through catalogs and flyers, advertisements in national periodicals, and telephone calls. It made approximately $1 million in sales to approximately 3000 North Dakota customers, making all deliveries by mail or common carrier from out-of-state. Id., 302. In addition, the court noted with approval the state's assertion that it had provided the following benefits to the seller: it had created an economic climate that had fostered demand for the seller's products; it maintained a legal infrastructure that protected that market; and it disposed of twenty-four tons of catalogs and flyers mailed into the state by the seller every year. Id., 304. On this record, the court concluded that "there is no question that [the seller] has purposefully directed its activities at North Dakota residents, that the magnitude of those contacts is more than sufficient for due process purposes, and that the use tax is related to the benefits [the seller] receives from access to the State. We therefore agree with the North Dakota Supreme Court's conclusion that the Due Process Clause does not bar enforcement of that State's use tax against [the seller]." Id., 308.[15]

In light of this development in the law of due process and taxation, the question in the present case becomes

[15] In part IV of its opinion, however, the majority of the United States Supreme Court held that, for purposes of the application of the commerce clause to the duty to collect and pay a sales tax, the "bright line" rule requiring a physical presence in the taxing state would still be required. *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 309–20.

whether the contacts between the testamentary trusts and Connecticut are sufficient constitutionally for Connecticut to treat the trusts as if they were domiciliaries of the state and, therefore, for Connecticut to tax the undistributed income of the trusts. We conclude that they are.

It is well established that a state may tax all of the income of one of its domiciliaries, irrespective of the source of that income, geographical or otherwise. *Oklahoma Tax Commission* v. *Chickasaw Nation*, 515 U.S. 450, 462–63, 115 S. Ct. 2214, 132 L. Ed. 2d 400 (1995) (applying "well-established principle of interstate and international taxation—namely, that a jurisdiction, such as Oklahoma, may tax *all* of the income of its residents, even income earned outside the taxing jurisdiction" [emphasis in original]). Indeed, the court noted that "[t]his general principl[e] . . . ha[s] international acceptance. American Law Institute, Federal Income Tax Project: International Aspects of United States Income Taxation 4, 6 (1987) . . . ." (Citation omitted; internal quotation marks omitted.) *Oklahoma Tax Commission* v. *Chickasaw Nation*, supra, 463.[16]

Traditionally, the due process justification for permitting a domiciliary to be taxed on his or her income, irrespective of its source, is based upon the fact that

---

[16] We recognize, as the plaintiff points out, that in 1982, Justice O'Connor in her dissent in *ASARCO, Inc.* v. *Idaho State Tax Commission,* supra, 458 U.S. 346–47, predicted: "The Court thus made clear only two years ago that a State of domicile cannot expect automatically to meet the due process requirements for the taxation of investment income. As with a nondomiciliary State, a domiciliary State may tax investment income *only if it confers benefits on or affords protection to the investment activity.* Mere assertion of the arbitrary legal fiction that intangible property is located at its owner's domicile no longer suffices to repel a reluctant taxpayer's due process attack." (Emphasis added.) It is clear, however, from the Supreme Court's subsequent emphatic reassertion in *Oklahoma Tax Commission* v. *Chickasaw Nation,* supra, 515 U.S. 463, of the power of a state to tax all of the income of a domiciliary, that this prediction was inaccurate.

the domiciliary state, by virtue of its legal system, provides the social structure pursuant to which the domiciliary receives and enjoys that income. Taxation of a domiciliary "is founded upon the protection afforded by the state to the recipient of the income in his person, in his right to receive the income and in his enjoyment of it when received. These are rights and privileges which attach to domicil within the state. To them and to the equitable distribution of the tax burden, the economic advantage realized by the receipt of income and represented by the power to control it, bears a direct relationship." *New York ex rel. Cohn* v. *Graves*, 300 U.S. 308, 313, 57 S. Ct. 466, 81 L. Ed. 666 (1937); id., 316 (state may tax domiciliary on rental income from real property located outside state, and on interest income from bonds located and secured by mortgages on property outside state); *Lawrence* v. *State Tax Commission*, 286 U.S. 276, 281, 52 S. Ct. 556, 76 L. Ed. 1102 (1932) (state may tax domiciliary on income received from work performed outside state); see also *Cream of Wheat Co.* v. *Grand Forks*, 253 U.S. 325, 328–29, 40 S. Ct. 558, 64 L. Ed. 931 (1920) (state may tax corporation incorporated in state on value of intangible personal property located outside state).

Furthermore, on much the same reasoning, as the plaintiff suggests, the "United States Supreme Court itself has validated the proposition that the State where the trustee is located provides constitutionally significant protections, opportunities and benefits to the trust for tax purposes." See *Greenough* v. *Tax Assessors*, 331 U.S. 486, 488, 67 S. Ct. 1400, 91 L. Ed. 1621 (1947) (Rhode Island municipality permitted to impose proportional ad valorem tax on out-of-state trust based solely on fact that one of two trustees resided in Rhode Island, even though trust property maintained in New York, trust beneficiary domiciled in New York, and Rhode Island trustee did not exercise trust powers in Rhode

Island). The court's reasoning was that the state was entitled to treat the resident trustee like one of its individual domiciliaries, in the sense of exacting from it a tax because of the benefits and protections that its legal system provided to it. Id., 496. "A resident trustee of a foreign trust would be entitled to the same advantages from Rhode Island laws as would any natural person there resident." Id., 495. "Rhode Island has imposed this tax, it may be presumed, for the general advantages of living within the jurisdiction." (Internal quotation marks omitted.) Id., 499 (Frankfurter, J., concurring).

Thus, in the present case, as the plaintiff does not dispute, if the trustee was located in Connecticut, this state could tax the trust's undistributed income consistent with due process of law, even though, for example, the trustee in fact made all of its investment decisions, and kept the actual cash and securities of the trust in accounts in a New York office. The reason for this is that, by virtue of its legal system, Connecticut would be providing the legal benefits and protections that enabled the trustee to perform its functions.

Similarly, the plaintiff suggests that the state where the trust is administered constitutionally may tax the income of the trust "because the State provides the locale for the bookkeeping, accounts and other instruments of trust income and investment." See, e.g., *Pabst* v. *Wisconsin Dept. of Taxation,* 19 Wis. 2d 313, 329, 120 N.W.2d 77 (1963) (sufficient nexus for taxation of income of trust where "the trust's business was transacted [in the taxing state] during the [taxing] period in question"). Thus, in the present case, if the trustee, although located in New York, had a trust administration office in Connecticut where it kept the trusts' accounts and made their investment decisions, Connecticut could tax the trusts' undistributed income. Presumably the same rationale would justify the imposition of that tax in light of the legal benefits and protections

provided by the state to the process of trust administration.

Admittedly, neither the trustee, its function of administering the trusts, nor the tangible evidence of the trusts' intangible assets—the "cash" and the actual security certificates[17]—is located in Connecticut. This state, however, by virtue of its legislative scheme, in effect has taken the practical position of treating the seats of the trusts—where they were established, and where their principal legal protections and benefits have been and are provided—as domiciliaries of the state. In passing on the constitutionality of a tax, "we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." (Internal quotation marks omitted.) *Wisconsin* v. *J. C. Penney Co.*, supra, 311 U.S. 444. The "practical operation of the statute . . . controls constitutionality, and not the form in which a State has cast a tax." *Greenough* v. *Tax Assessors*, supra, 331 U.S. 499–500 (Frankfurter, J., concurring). For purposes of due process of law, we see nothing less compelling about the benefits and opportunities provided by Connecticut to these trusts by its legal and judicial systems than those benefits provided by states in which either the trustee or the administration of a trust might be located.

---

[17] The plaintiff asserts, and it is undisputed for purposes of this case, that the intangible assets of the trusts were "located" in New York, that is, were in accounts of the plaintiff in New York. Of course, although there may well be actual, physical certificates of securities owned by the trusts sitting in a vault somewhere in New York, the same certainly cannot be said of the "cash." That undoubtedly consists only of an entry on the books of the plaintiff in its commercial banking, not its trustee's capacity, and a corresponding legal obligation on the plaintiff as trustee to pay the amount of that entry upon proper order. We note this only to underscore the ephemeral quality of the physical location of intangible assets that the plaintiff asserts as one of the outer limits of a state's income taxing power under the due process clause.

Indeed, the United States Supreme Court has recognized the analogy between a domiciliary and the seat of a trust for purposes of taxation. "For the purpose of the taxation of those resident within her borders, Rhode Island has sovereign power unembarrassed by any restriction except those that emerge from the Constitution. Whether that power is exercised wisely or unwisely is the problem of each state. It may well be that sound fiscal policy would be promoted by a tax upon trust intangibles levied only by the state that is the seat of a testamentary trust." Id., 490. "There may be matters of trust administration which can be litigated only in the courts of the state that is the seat of the trust. For example, in the case of a testamentary trust, the appointment of trustees, settlement, termination and distribution under the provisions of the trust are to be carried out, normally, in the courts of [the] decedent's domicile." Id., 495. The court also has recognized that a trust is " 'an abstraction,' " that for purposes of taxation it "is sometimes dealt with as though it had a separate existence," and that it may, for such purposes, be dealt with as an "entity" consisting of "separate interests, the equitable interest in the res of the beneficiary and the legal interest of the trustee." Id., 493–94.

Thus, just as a state may tax all of the income of a domiciliary, irrespective of its source, because of the legal benefits and opportunities it provides that permit the beneficiary to receive and enjoy the income, so may Connecticut tax the income of these testamentary trusts because of the benefits and opportunities that it provides to them. All of the testamentary trusts were established under their respective wills because the laws of this state provide for such establishment. *Blodgett* v. *Bridgeport City Trust Co.*, 115 Conn. 127, 142, 161 A. 83 (1932). The validity of a testamentary trust is normally determined by the validity of the will, which in turn is ordinarily determined by the law of the testator's

domicile. R. Hendrickson & N. Silverman, Changing the Situs of a Trust (1998) § 1A.02 [1]. Thus, Connecticut's laws assure the continued existence of the trusts as mechanisms for the disposition of the testators' property according to the terms of the trusts as provided by the respective wills. In addition, the original trustees and their successors were approved by the respective Probate Courts in which the wills were probated.

With respect to the Dallett Trust and the Worcester Trust specifically, from the inception of the trusts the Connecticut Probate Courts have been charged with extensive responsibilities for legal and administrative oversight. This oversight includes the specific powers and responsibilities: (1) to call the trustee to account for the trust estate; General Statutes § 45a-98;[18] (2) to

---

[18] General Statutes § 45a-98 provides in relevant part: "(a) Courts of probate in their respective districts shall have the power to (1) grant administration of intestate estates of persons who have died domiciled in their districts and of intestate estates of persons not domiciled in this state which may be granted as provided by section 45a-303; (2) admit wills to probate of persons who have died domiciled in their districts or of nondomiciliaries whose wills may be proved in their districts as provided in section 45a-287; (3) except as provided in section 45a-98a or as limited by an applicable statute of limitations, determine title or rights of possession and use in and to any real, tangible or intangible property that constitutes, or may constitute, all or part of any trust, any decedent's estate, or any estate under control of a guardian or conservator, which trust or estate is otherwise subject to the jurisdiction of the Probate Court, including the rights and obligations of any beneficiary of the trust or estate and including the rights and obligations of any joint tenant with respect to survivorship property; (4) except as provided in section 45a-98a, construe the meaning and effect of any will or trust agreement if a construction is required in connection with the administration or distribution of a trust or estate otherwise subject to the jurisdiction of the Probate Court, or, with respect to an inter vivos trust, if that trust is or could be subject to jurisdiction of the court for an accounting pursuant to section 45a-175, provided such an accounting need not be required; (5) except as provided in section 45a-98a, apply the doctrine of cy pres or approximation; (6) to the extent provided for in section 45a-175, call executors, administrators, trustees, guardians, conservators, persons appointed to sell the land of minors, and attorneys-in-fact acting under powers of attorney created in accordance with section 45a-562, to account concerning the estates entrusted to their charge; and (7) make any lawful

require a bond of the trustee under appropriate circumstances, even where the will excuses a bond; General Statutes § 45a-473;[19] (3) to fill a vacancy in the office of trustee if a trustee were to resign or decline to serve; General Statutes § 45a-474;[20] (4) to authorize the sale of real estate held by the trustee; General Statutes § 45a-164;[21] (5) to require the trustee to render periodic

orders or decrees to carry into effect the power and jurisdiction conferred upon them by the laws of this state. . . ."

[19] General Statutes § 45a-473 provides: "When a testator has appointed a trustee to execute a trust created by his will, the court of probate having jurisdiction of the settlement of his estate shall, unless otherwise provided in the will, require of such trustee a probate bond. If any trustee refuses to give such bond, the refusal shall be deemed a refusal to accept or perform the duties of such trust; but the bond without surety of any public or charitable corporation or cemetery association to which any bequest or devise is made in trust shall be deemed sufficient. Whenever by any will it is provided that the trustee or trustees thereunder shall not be required to give a probate bond, or shall be required to give a bond which in the judgment of the court of probate having jurisdiction is insecure or inadequate, the court may, upon the application of any person interested, require such trustee or trustees at any time to furnish a probate bond in accordance with section 45a-139."

[20] General Statutes § 45a-474 provides: "When any person has been appointed trustee of any estate, or holds as trustee the proceeds of any estate sold, and no provision is made by law or by the instrument under which his appointment is derived for the contingency of his death or incapacity or for his refusal to accept such trust or for his resignation of such trust, or when a trust has been created by will and no trustee has been appointed in the will or when more than one trustee has been appointed and thereafter a trustee so appointed dies, becomes incapable, refuses to accept or resigns such trust, the court of probate of the district within which the estate is situated, or, when the trust has been created by will, in the district having jurisdiction of such will, may, on the happening of any such contingency, appoint some suitable person to fill such vacancy, taking from him a probate bond, unless in the case of a will it is otherwise provided therein, in which case the provisions of section 45a-473 shall apply."

[21] General Statutes § 45a-164 provides in relevant part: "(a) Upon the written application of the conservator of the estate of any person, guardian of the estate of any minor, temporary administrator, administrator or trustee appointed by the court, including a trustee of a missing person, or the executor or trustee under any will admitted to probate by the court, after such notice as the court may order and after hearing, the court may authorize the sale or mortgage of the whole or any part of, or any easement or other interest in, any real property in this state of such person, minor, missing

accounts, to hold hearings upon interim and final accounts, to pass on the propriety of such accounts, and to make such orders as are necessary to secure the due execution of the trustee's duties; General Statutes §§ 45a-178 and 45a-179;[22] (6) upon the allowance of interim and final accounts, to determine the rights of the trustee and the interested parties; General Statutes §§ 45a-175 through 45a-177;[23] and (7) to make appro-

person, deceased person or trustee, or of any real property the legal title to which has been acquired by such temporary administrator, administrator, executor or trustee, if the court finds it would be for the best interests of the parties in interest to grant the application. . . ."

[22] General Statutes § 45a-178 provides: "The Court of Probate shall direct what notice, if any, shall be given to the parties in interest of the filing of any account described in section 45a-177, and of the hearing thereon, and may adjust and allow the account. The court may make any order necessary and proper to secure the execution of the duties of such fiduciary, subject to appeal as in other cases."

General Statutes § 45a-179 provides: "(a) When a conservator, guardian, trustee in insolvency or trustee of a testamentary trust exhibits his final account to the Court of Probate for allowance, the court shall appoint a time and place for a hearing on the account and shall cause notice of the hearing to be given as it directs. Such fiduciary shall swear or affirm under oath to the truth of the account.

"(b) The court shall, before approving a final account of an executor or administrator, hold a hearing thereon for which notice may be given as the court shall direct, unless all parties interested in the estate sign and file in court a written waiver of such notice."

[23] General Statutes § 45a-175 provides: "(a) Courts of probate shall have jurisdiction of the interim and final accounts of testamentary trustees, trustees appointed by the courts of probate, conservators, guardians, persons appointed by probate courts to sell the land of minors, executors, administrators and trustees in insolvency, and, to the extent provided for in this section, shall have jurisdiction of accounts of the actions of trustees of inter vivos trusts and attorneys-in-fact acting under powers of attorney.

"(b) A trustee or settlor of an inter vivos trust or an attorney-in-fact or the successor of the trustee, settlor or attorney-in-fact or the grantor of such power of attorney or his legal representative may make application to the court of probate for the district where the trustee, or any one of them, or the attorney-in-fact has any place of business or to the court of probate for the district where the trustee or any one of them or the settlor or the attorney-in-fact or the grantor of the power resides or, in the case of a deceased settlor or grantor, to the court of probate having jurisdiction over the estate of the settlor or grantor or for the district in which the settlor

priate orders regarding the distribution of the trust

or grantor resided immediately prior to death for submission to the jurisdiction of the court of an account for allowance of the trustee's or attorney's actions under such trust or power.

"(c) (1) Any beneficiary of an inter vivos trust may petition a court of probate having jurisdiction under this section for an accounting by the trustee or trustees. The court may, after hearing with notice to all interested parties, grant the petition and require an accounting for such periods of time as it determines are reasonable and necessary on finding that: (A) The beneficiary has an interest in the trust sufficient to entitle him to an accounting, (B) cause has been shown that an accounting is necessary, and (C) the petition is not for the purpose of harassment.

"(2) A court of probate shall have jurisdiction to require an accounting under subdivision (1) of subsection (c) of this section if (A) a trustee of the trust resides in its district, (B) in the case of a corporate trustee, the trustee has any place of business in the district, (C) any of the trust assets are maintained or evidences of intangible property of the trust are situated in the district, or (D) the settlor resides in the district or, in the case of a deceased settlor, resided in the district immediately prior to death.

"(3) As used in subdivision (1) of subsection (c) of this section, 'beneficiary' means any person currently receiving payments of income or principal from the trust, or who may be entitled to receive income or principal or both from the trust at some future date, or the legal representative of such person.

"(d) The action to submit an accounting to the court, whether by an inter vivos trustee or attorney acting under a power of attorney or whether pursuant to petition of another party, shall not subject the trust or the power of attorney to the continuing jurisdiction of the Probate Court.

"(e) If the court finds such appointment to be necessary and in the best interests of the estate, the court upon its own motion may appoint an auditor to be selected from a list provided by the Probate Court Administrator, to examine accounts over which the court has jurisdiction under this section, except those accounts on matters in which the fiduciary or cofiduciary is a corporation having trust powers. The Probate Court Administrator shall promulgate regulations in accordance with section 45a-77 concerning the compilation of a list of qualified auditors. Costs of the audit may be charged to the fiduciary, any party in interest and the estate, in such proportion as the court shall direct if the court finds such charge to be equitable. Any such share may be paid from the fund established under section 45a-82, subject to the approval of the Probate Court Administrator, if it is determined that the person obligated to pay such share is unable to pay or to charge such amount to the estate would cause undue hardship.

"(f) Upon the allowance of any such account, the court shall determine the rights of the fiduciaries or the attorney-in-fact rendering the account and of the parties interested in the account, subject to appeal as in other cases. The court shall cause notice of the hearing on the account to be

assets upon its termination. General Statutes §§ 45a-

given in such manner and to such parties as it directs.

"(g) In any action under this section, the Probate Court shall have, in addition to powers pursuant to this section, all the powers available to a judge of the Superior Court at law and in equity pertaining to matters under this section."

General Statutes § 45a-176 provides: "Except when any beneficiary is a trustee of a testamentary or inter vivos trust, if any fiduciary of a decedent's estate is one of the beneficiaries of the residue of the estate, and if all dispositions, if any, to other beneficiaries are bequests of specific personal property or of an amount certain or devises of specific real property, any fiduciary may, in lieu of any other accounting required under this chapter, file with the court of probate having jurisdiction of the estate a statement under the penalties of false statement that all debts, funeral expenses, taxes and expenses of administration have been paid, and all bequests and devises have been or will be distributed. The statement shall include the total of any amount reported on the return of claims filed under section 45a-397, an itemized list of all funeral expenses, taxes and expenses of administration, and a representation that all distributees have received a copy of the statement. Any distributee or other interested party not satisfied with the adequacy or content of the statement may request the filing of an account under section 45a-175 or object to the statement by petitioning the court for a hearing at any time prior to the court's approval of the statement. The court may, for cause shown, refuse to accept the statement and require an accounting from the fiduciary. The court of probate may enter a decree releasing and discharging the fiduciary and the sureties on his bond, if any, from any further liability."

General Statutes § 45a-177 provides: "(a) All conservators, guardians, persons appointed by the Court of Probate to sell land of minors and trustees, including those entrusted with testamentary trusts unless excused by the will creating the trust, shall render periodic accounts of their trusts under oath to the Court of Probate having jurisdiction for allowance, at least once during each three-year period and more frequently if required to do so by the will or trust instrument creating the trust. Periodic accounts for filing only may be submitted to the court at any time during each three-year period. Upon receipt of a periodic account, the court shall cause notice of it and of its availability for examination at the court to be given in such manner and to such parties as it deems reasonable. Any such party may apply to the court for a hearing on the account. If an application for such a hearing is not received by the court from a party in interest within the time stated in the notice, the periodic account will be filed without hearing thereon and without allowance or disallowance thereof, and shall not be recorded. At the end of each three-year period from the date of the last allowance of a periodic account, or upon the earlier receipt of a final account, there shall be a hearing on all periodic accounts not previously allowed, and the final account, if any, in accordance with sections 45a-178 and 45a-179.

481 through 45a-483.[24] Moreover, the exercise of these

"(b) Each such periodic account shall include an inventory of the trust estate showing fully how the principal of the fund is invested and the items of income and expenditure. If there has been no change in the identity of the items comprising the principal of the fund since the last account which has been accepted and approved, it shall not be necessary to include an inventory of the trust estate.

"(c) If the estate held by any person in any such fiduciary capacity is less than two thousand dollars, or, in the case of a corporate fiduciary under the supervision of the Commissioner of Banking or any other fiduciary bonded by a surety company authorized to do business in this state, ten thousand dollars, he shall not be required to render such account unless so ordered by the court."

[24] General Statutes § 45a-481 provides: "The trustee of any testamentary trust which has terminated may, unless the will creating the trust otherwise directs, after settling his final account, deliver the property remaining in his hands to the remainderman upon the order of the Probate Court, without returning the same to the estate of the decedent."

General Statutes § 45a-482 provides: "When the facts at the time of distribution from an estate to a trust or from a testamentary trust to a successive trust are such that no trust would be operative under the terms of the instrument creating such trust or successive trust because of the death of the life tenant, or because the beneficiary has reached a stipulated age, or if such trust would qualify for termination under section 45a-484, or for any other reason, the fiduciary of such estate or prior trust may distribute, with the approval of the court of probate having jurisdiction, directly from the estate or prior trust to the remaindermen of such trust, the corpus of such trust and any income earned during the period of estate administration or administration of the prior trust and distributable to such remaindermen, without the interposition of the establishment of such trust or successive trust. If distribution is based on the fact that the trust would qualify for termination under section 45a-484, reasonable notice shall be provided to all beneficiaries who are known and in being and who have vested or contingent interests in the trust."

General Statutes § 45a-483 provides: "The trustee of any trust for the benefit of any person who has been absent from his home and unheard of for seven years or more may settle his account as such trustee in the court of probate having jurisdiction thereof. Upon the order of the court, the trustee shall distribute such trust estate to the persons entitled to the remainder thereof as determined by the court, and the trustee shall not thereafter be liable to any such absent beneficiary, his heirs, executors, administrators or assigns in any action for such trust estate or any interest therein or income thereof. A person shall not be entitled to receive any portion of such estate from the trustee until such person has filed in the court of probate a bond with surety to the acceptance of the court, payable to the state, conditioned to return such trust estate to the trustee or his successor

powers and responsibilities benefits both beneficiaries and trustees alike. It benefits the beneficiaries because: the probate courts serve as the repository of the documents that define the beneficiaries' rights and that detail how their financial interests are being managed; the probate courts give legal effect to those documents and oversee those rights and interests; and those courts remain open and available to ensure that the beneficiaries' rights are being protected. It benefits the trustee because it provides the legal cloak of approval that helps to shield the trustee from later claims of mismanagement or other misconduct. Thus, submission of accounts and any other matters of trust administration to, and approval by, the probate court gives the trustee the assurance that its administration of the trust will not be successfully challenged at a later time.

With respect to the Parry Trust and the Stewart Trust, the wills establishing those trusts excused the trustee from rendering periodic accounts. This privilege, however, was afforded by § 45a-177. Furthermore, the final and only account of the Stewart Trust was approved by the Probate Court, thus affording the beneficiaries the legal assurance that their rights had been protected adequately throughout the administration of the trust and that the trust assets had been distributed properly, and affording the trustee the legal assurance that its administration would not be challenged later. Similarly, when the Parry Trust terminates, the trustee will be required to file a final account, which upon approval will afford the beneficiaries and the trustee the same assurances. In addition, with respect to both trusts, if at any time any beneficiary wishes or wished to question

on the reappearance of the person presumed to be dead within thirteen years from the date of such order authorizing distribution. After the expiration of such thirteen-year period, such person entitled to the remainder shall not be liable to any such absent beneficiary, his heirs, executors, administrators or assigns in any action for such trust estate or any interest therein or income thereof."

the administration of the trust by the trustee, the Probate Court would be open and available for that purpose. See 4 G. Wilhelm & R. Folsom, Connecticut Estate Practice, Jurisdiction and Procedure (1983) § 54, p. 162 and § 59, p. 177.

We conclude that this panoply of legal benefits and opportunities is comparable to those general legal benefits and opportunities that justify the imposition of taxes on the income of individual domiciliaries of the state. Just as the vitality of the trust as an economic entity is inextricably intertwined with the administration of the trust assets by a trustee located in New York, the viability of the trust as a legal entity is inextricably intertwined with the benefits and opportunities provided by the legal and judicial systems of Connecticut, and its legal viability is inextricably intertwined with its economic vitality. Neither its economic vitality nor its legal viability trumps the other for purposes of due process and taxation. These contacts with Connecticut are sufficiently "fiscal" in nature to satisfy the due process clause, and gave the testamentary trusts fair warning that they were subject to its tax jurisdiction.

This conclusion is consistent with that of the only court that has considered this precise question since *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 298, was decided. In *District of Columbia* v. *Chase Manhattan Bank,* 689 A.2d 539, 540 (D.C. App. 1997), the District of Columbia Court of Appeals held that "the District of Columbia, consistent with the Due Process Clause, [may] tax the annual net income of a testamentary trust created by the will of an individual who died while domiciled in the District, when the trustee, trust assets, and trust beneficiaries are all presently located outside the District." We agree with that court's reasoning that "the relationship between the [state] and the testamentary trust of one of its residents is sufficiently close to justify the [state's] classification of the trust itself as a

resident for purposes of taxation. A testamentary trust of a [state] resident, which has been probated in the courts of the [state], has a relationship to the [state] distinct from the relationship, if any, between the [state] and the trustee or trust assets. The [state's] unquestioned power to resolve disputes over the trust and to order accountings to protect the trust corpus and beneficiaries from potential malfeasance by the trustee reflects the [state's] justifiable, though not necessarily exclusive, jurisdiction over the trust itself. One commentator has characterized this authority as follows: 'Under the "trust entity" theory, a testamentary trust is established and remains at the testator's domicile, thereby giving the domiciliary court in rem jurisdiction independent and apart from the presence of the trustee, the trust assets or the trust beneficiaries.' [G. Bogert, Trusts (6th Ed. 1987) § 177, p. 686]." *District of Columbia* v. *Chase Manhattan Bank*, supra, 544; see also *First National Bank of Boston* v. *Harvey*, 111 Vt. 281, 297, 16 A.2d 184 (1940) (due process of law does not preclude state from taxing income of testamentary trust of domiciliary of state). We disagree, moreover, with the cases decided prior to *Quill Corp.* that have reached a contrary conclusion. See *Augusta* v. *Kimball*, 91 Me. 605, 40 A. 666 (1898); *In re Swift* v. *Director of Revenue*, 727 S.W.2d 880 (Mo. 1987); *Pennoyer* v. *Taxation Division Director*, 5 N.J. Tax 386 (1983); *Taylor* v. *State Tax Commission*, 85 App. Div. 2d 821, 445 N.Y.S.2d 648 (1981).

We also disagree with the plaintiff's contention that, because *Quill Corp.* involved the collection and payment of a sales tax and the present case involves an income tax, *Quill Corp.* is irrelevant to this case. First, in restating the second part of the two part test for measuring the limitations on taxation imposed by the due process clause, the court in *Quill Corp.* itself referred to the requirement "that the income attributed

to the State for tax purposes must be rationally related to values connected with the taxing State . . . ." (Citation omitted; internal quotation marks omitted.) *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 306. Thus, the reference to "income" in the context of a sales tax case suggests that the court, in borrowing the adjudicative jurisdictional due process analytic rubric, did not intend to confine that analytic model to sales taxes. Second, the reasoning of *Quill Corp.* does not suggest that the comparable reasoning that it employed—between due process for adjudicative purposes and due process for tax purposes—was confined only to the sales tax context. Although the application of the test may yield different results depending on the type of tax to which it is applied, we can perceive no reason why the fundamental due process test itself should vary depending on the type of tax involved. Indeed, Justice Scalia in his concurrence in *Quill Corp.* stated that, although he did not understand the court to have held that "the due process standards for adjudicative jurisdiction and those for legislative (or prescriptive) jurisdiction are necessarily identical"; id., 319–20; "[i]t is difficult to discern any principled basis for distinguishing between jurisdiction to regulate and jurisdiction to tax." Id., 319 (Scalia, J., concurring).

The plaintiff also argues that implicit in the due process test for taxation are the requirements "that the benefits provided by the State seeking to tax be contemporaneous with the imposition of the tax," and that there be a nexus between the benefits provided by the state and "the earning of the income which is the subject of the taxation." To the extent that the first of these implicit requirements, namely, contemporaneity, suggests that the benefits be more than historical, we agree. We think that it is implicit in the due process test that the benefits afforded by the state to a domiciliary, or its functional equivalent, justifying the taxation of its

income, must generally span the time period during which the income was earned, and not solely antedate that time period without any continuing effect. The panoply of benefits afforded in the present case, however, amply meets that test. To the extent, however, that the plaintiff suggests that the benefits afforded by the state be related directly to the earning of the income—in the sense of being specifically economic or fiscal benefits—we disagree with the plaintiff. The general legal and social benefits afforded to a domiciliary that justify a state's taxation of a domiciliary's income are no more specifically economic or fiscal than those afforded by the state to the testamentary trusts involved in the present case.

The same reasoning applies to the plaintiff's contention that a "State that seeks to treat a taxpayer as a domiciliary for tax purposes, and to impose an unapportioned income tax upon all of the taxpayer's income, as Connecticut does in this case, must show greater 'fiscally' relevant contacts than a State that seeks to tax only a discrete portion of the taxpayer's income." Having legitimately chosen to treat these testamentary trusts as if they were domiciliaries for tax purposes, and having established sufficient minimum contacts with them to do so consistent with due process of law, the state also was entitled to tax all of their income, wherever generated, like that of other domiciliaries. We see nothing either in precedent or policy that requires more contacts for a resident trust than for an individual domiciliary.

## B

### The Inter Vivos Trust

The plaintiff claims that the taxability of the undistributed income of the inter vivos trust violates the due process clause because: (1) the decision of the United States Supreme Court in *Safe Deposit & Trust Co.* v.

*Virginia,* 280 U.S. 83, 50 S. Ct. 59, 74 L. Ed. 180 (1929), is still good law and controls this issue; and (2) the residence of the beneficiary does not satisfy the due process requirement that the taxpayer's taxable activity purposefully be directed at the taxing state. Although this is a closer case than that with respect to the testamentary trusts, we conclude that the state's taxation scheme of the undistributed income of the *inter vivos* trust satisfies the due process clause.

The same fundamental test applies to the *inter vivos* test that applied to the testamentary trusts: whether "the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." (Internal quotation marks omitted.) *ASARCO, Inc.* v. *Idaho State Tax Commission,* supra, 458 U.S. 315. There must be some "definite link, some minimum connection between" the state and the income that it seeks to tax. *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 306.

In the present case, the critical link to the undistributed income sought to be taxed is the fact that the noncontingent beneficiary of the *inter vivos* trust during the tax year in question was a Connecticut domiciliary. The accumulated income eventually will be paid either outright to her when she reaches the age of forty-eight or, if she does not live that long, according to the exercise of her testamentary power of appointment or, in default of such exercise, to her then living descendants. Thus, during the tax year of 1993, as a Connecticut domiciliary she enjoyed all of the protections and benefits afforded to other domiciliaries. Her right to the eventual receipt and enjoyment of the accumulated income was, and so long as she is such a domiciliary will continue to be, protected by the laws of the state. We conclude that, just as a state may tax all of the present income of a domiciliary, irrespective of its place

or origin or the nature of its source, a state may, on the basis of the same justification, tax the income of an inter vivos trust that is accumulated for the ultimate benefit of a noncontingent domiciliary and that is subject to her ultimate power of disposition. Although the connection is more attenuated than in the case of a testamentary trust, it is sufficient for purposes of due process of law. Furthermore, just as the state may tax the undistributed income of a trust based on the presence of the trustee in the state because it gives the trustee the protection and benefits of its laws; see *Greenough* v. *Tax Assessors*, supra, 331 U.S. 496; it may tax the same income based on the domicile of the sole noncontingent beneficiary because it gives her the same protections and benefits. In both instances, the state has given something for which it can ask return, and there is a definite and sufficient link between the contact with the state and the income sought to be taxed.

This conclusion is consistent with the decision of the California Supreme Court in a closely analogous case. In *McCulloch* v. *Franchise Tax Board*, 61 Cal. 2d 186, 189–90, 390 P.2d 412, 37 Cal. Rptr. 636, appeal dismissed, 379 U.S. 133, 85 S. Ct. 278, 13 L. Ed. 2d 333 (1964), the court upheld, against a due process challenge, California's taxation of the undistributed income of an out-of-state testamentary trust based solely on the California residence of the beneficiary of the trust. We agree with the reasoning of the California Supreme Court that "[t]he laws of the state of residence afford benefit and protection to the resident beneficiary . . . ." Id., 195. "The tax imposed by California upon the beneficiary is constitutionally supported by a sufficient connection with, and protection afforded to, [the] plaintiff as such beneficiary. [The] [p]laintiff in the instant case has, in his role as beneficiary during the years of his residence in this state, enjoyed the protection accorded by California for his eventual receipt of these assets. California

grants the beneficiary the interim protection of its laws so that he may ultimately obtain the benefit of the accumulated income. . . . [The] [p]laintiff's residence here confers the essential minimum connection . . . necessary for due process of law." (Citations omitted; internal quotation marks omitted.) Id., 196–97.[25]

We are not persuaded that, as the plaintiff asserts, the holding of *Safe Deposit & Trust Co.* v. *Virginia,* supra, 280 U.S. 83, is still good law. In that case, a Virginia domiciliary had created an inter vivos trust of intangible personalty—stocks and bonds—of which a Maryland bank was trustee, and the stock and bond certificates were located in Maryland. The beneficiaries, however, were Virginia domiciliaries. Id., 89–90. The court held that the due process clause prohibited Virginia from imposing an ad valorem tax on the value of the intangibles the evidence of which was located in Maryland. Id., 93. The court reasoned that "intangibles—stocks, [and] bonds—in the hands of the holder of the legal title with definite taxable situs at its residence, not subject to change by the equitable owner, may [not] be taxed at the latter's domicile in another State." Id.

Central to the court's reasoning in *Safe Deposit & Trust Co.,* however, was the notion that the "adoption of a contrary rule would involve possibilities of an extremely serious character by permitting double taxation, both unjust and oppressive." (Internal quotation marks omitted.) Id. That notion is no longer viable. The risk of double taxation of intangibles has long been abandoned as a limitation on taxation under the due

[25] We disagree, therefore, with the reasoning of those cases relied on by the plaintiff in which courts have found the domicile of a beneficiary of an inter vivos trust insufficient for due process purposes. See *Blue* v. *Dept. of Treasury,* 185 Mich. App. 406, 462 N.W.2d 762 (1990); *Potter* v. *Taxation Division Director,* 5 N.J. Tax 399 (1983); *Mercantile-Safe Deposit & Trust Co.* v. *Murphy,* 15 N.Y.2d 579, 203 N.E.2d 490, 255 N.Y.S.2d 96 (1964).

process clause. *Curry* v. *McCanless*, 307 U.S. 357, 363, 59 S. Ct. 900, 83 L. Ed. 1339 (1939). Furthermore, the Supreme Court has affirmed that a domiciliary of a state who is a beneficiary of an out-of-state trust may be taxed on the trust income received by her, even though the other state also taxed the value of the trust property that generated the income, and in doing so the court specifically distinguished *Safe Deposit & Trust Co.* See *Guaranty Trust Co.* v. *Virginia,* 305 U.S. 19, 22 and n.1, 59 S. Ct. 1, 83 L. Ed. 16 (1938). Indeed, in their treatise on state taxation, Professors Jerome Hellerstein and Walter Hellerstein stated: "It is unlikely that the Supreme Court would now hold, on the weakened authority of the *Safe Deposit & Trust [Co.]* case and under the later Due Process Clause cases, that the Due Process Clause bars the State of a resident trust or estate from taxing a nonresident trustee on income accumulated by the trust from intangibles held by the trustee who resides outside the State and administers the trust there." 2 J. Hellerstein & W. Hellerstein, State Taxation (1992) ¶20.09 [2], p. 20-68.

We also are not persuaded by the plaintiff's contention that the absence of conduct constituting "purposeful direction" at Connecticut is fatal to the state's power to tax the undistributed income of the inter vivos trust in the present case. It is true that, in *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 307, as the plaintiff argues, the Supreme Court held that the out-of-state mail order seller's purposeful conduct toward the North Dakota market was a sufficient due process surrogate for a physical presence in North Dakota, for purposes of requiring the seller to collect and pay a sales tax. That does not mean, however, as the plaintiff's argument suggests, that such conduct is a sine qua non of due process tax analysis in all contexts. Purposeful conduct may serve to satisfy the minimum contacts requirement.

So may, however, the presence in the state of a noncontingent beneficiary who receives the benefits and protections of the state's laws. *McCulloch* v. *Franchise Tax Board*, supra, 61 Cal. 2d 195.

## II

## THE COMMERCE CLAUSE

The plaintiff claims that the taxation scheme applied to the testamentary trusts and the inter vivos trust in the present case violates the commerce clause of the constitution because: (1) there is an undue risk of systematic, multiple taxation on the income of the trusts; and (2) Connecticut does not provide a tax credit for any taxes paid to any other state by the trusts. We disagree.

We first consider, and reject, the defendant's argument that the commerce clause does not apply because the trusts are not engaged in interstate commerce. In this respect, the entities that are affected by the state taxing scheme are in-state banks and out-of-state banks that provide financial services to trusts as trustees. Although there is nothing in this record to indicate the degree of competition between the two groups, it is fair to assume, in this economy, that they may be actual or prospective competitors to provide such services to the Connecticut market for them. See *General Motors Corp.* v. *Tracy*, 519 U.S. 278, 300, 117 S. Ct. 811, 136 L. Ed. 2d 761 (1997) (presence of actual or prospective competition between supposedly favored and disfavored entities in single market determines applicability of commerce clause).

We next address whether, as the plaintiff contends, there is no credit available to resident trusts, like those in the present case, for income taxes paid to another taxing state, or whether, as the defendant suggests, a credit is available to these trusts. The question of the availability of a credit is significant because, to the

extent that such a credit is available, the risk of multiple taxation is eliminated. We conclude that such a credit generally is available under the tax statutes and regulations, but that it only extends to taxes paid on income derived from real or tangible personal property, or from a business, trade, occupation or profession, and does not extend to taxes paid on income derived from intangible personalty, such as dividends, interest and capital gains from the sale of securities.[26] Therefore, because

[26] General Statutes § 12-704 (a) provides in relevant part: "Any resident or part-year resident of this state shall be allowed a credit against the tax otherwise due under this chapter in the amount of any income tax imposed on such resident or part-year resident for the taxable year by another state of the United States . . . *on income derived from sources therein* and which is also subject to tax under this chapter. . . ." (Emphasis added.)

Although the statutes do not specifically define the term "income derived from *sources therein*," they do, throughout, use the analogous term "*sources within this state*"; (emphasis added); see, e.g., General Statutes § 12-700 (b) (1) ("[t]here is hereby imposed on the Connecticut taxable income derived from or connected with sources within this state"); and that term is defined as follows: "Items of income, gain, loss and deduction derived from or connected with sources within this state shall be those items attributable to: (A) The ownership or disposition of any interest in real or tangible personal property in this state; or (B) a business, trade, profession or occupation carried on in this state; or (C) in the case of a shareholder of an S corporation, the ownership of shares issued by such corporation, to the extent determined under section 12-712." General Statutes § 12-711 (b) (1). Furthermore, "[i]ncome from intangible personal property, including annuities, dividends, interest and gains from the disposition of intangible personal property, shall constitute income derived from sources within this state only to the extent that such income is from property employed in a business, trade, profession or occupation carried on in this state." General Statutes § 12-711 (b) (2).

The defendant has, by regulation, provided that: " 'Income derived from or connected with sources within a qualifying jurisdiction' is to be construed so as to accord with the definition of the term 'derived from or connected with sources within this state' set forth in Part II in relation to the adjusted gross income of a nonresident individual. Thus, the credit against Connecticut income tax is allowed for income tax imposed by another jurisdiction upon compensation for personal services performed in the other jurisdiction, income from a business, trade or profession carried on in the other jurisdiction, and income from real or tangible personal property situated in the other jurisdiction. . . ." Regs., Conn. State Agencies § 12-704 (a)-4 (3). Moreover, the defendant has, by regulation, also provided that a resident trust

the property of all of these trusts consisted only of cash and securities in the tax year in question, no credit would have been available to them under the current tax scheme.[27]

The so-called "dormant commerce clause" refers, not to the affirmative grant to Congress to "regulate Commerce with foreign Nations, and among the Several States"; U.S. Const., art. I, § 8; but to the clause's "negative sweep . . . . The Clause, in Justice Stone's phrasing, 'by its own force' prohibits certain state actions that interfere with interstate commerce." *Quill Corp.* v. *North Dakota*, supra, 504 U.S. 309. In *Complete Auto Transit, Inc.* v. *Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977), the United States Supreme Court developed a four part test for measuring state taxes against a dormant commerce clause challenge. "[W]e will sustain a tax against a Commerce Clause challenge so long as the 'tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.' [Id.]." *Quill Corp.* v. *North Dakota*, supra, 311. This test emphasizes "the importance of looking past the formal language of the tax statute [to] its practical effect . . . ." (Citation omitted; internal quotation marks omitted.) Id., 310.

The plaintiff does not focus on any one part of this test. Instead, it argues that "a critical principle that

___

or estate is entitled to the same credit that would be available to an individual resident of Connecticut. Regs., Conn. State Agencies § 12-704 (a)-1. Thus, as the plaintiff maintains, so-called "source income," whether in-state or out-of-state, ordinarily does not include interest and dividend income, or capital gains from the sale of securities. Therefore, the trusts involved in the present case, although not in fact taxable on their income by any other jurisdiction, would not have been entitled to a credit for such tax if they had been so taxed.

[27] It is also true, however, that, to the extent that any trust invested in real or tangible personal property, or in a trade, business or profession,

animates [the *Complete Auto Transit, Inc.* test]" is that it "is intended to preserve the long-standing prohibition against any State tax that subjects interstate commerce to a risk of systematic, multiple taxation." Specifically, with respect to the testamentary trusts, the plaintiff contends that testators will have an incentive to appoint only Connecticut trustees because appointing a trustee in another state "necessarily subjects the testamentary trust to the risk of a second income tax in that State." Thus, the plaintiff argues, this incentive "unconstitutionally promotes in-state trustees by subjecting trusts administered by out-of-state trustees to a risk of multiple taxation." With respect to the inter vivos trust, the plaintiff contends that this risk is compounded because, in addition to the risk of an additional income tax in the state of residence of the trustee, "the presence of [other] such out-of-state [noncontingent] beneficiaries increases the risk of multiple taxation even further."[28] Although we agree that there are such incentives and risks, we conclude that they are too remote and speculative to constitute a dormant commerce clause violation.

The plaintiff concedes that not all risks of multiple taxation run afoul of the dormant commerce clause, because it is not the purpose of the clause to relieve those engaged in interstate commerce from bearing their fair share of state tax burdens. *Complete Auto Transit, Inc.* v. *Brady*, supra, 430 U.S. 279. The plaintiff contends, however, that the incentive for Connecticut testators and settlors to select Connecticut trustees over out-of-state trustees because of the risk of multiple

located in this state, the taxes paid to another state on the income generated thereby would be available for a tax credit in Connecticut.

[28] We note, however, in this regard, that the presence in other states of noncontingent beneficiaries does not increase the amount of the taxes imposed by Connecticut, which are calculated only proportionally to the number of Connecticut noncontingent beneficiaries. Thus, any risk of multiple taxation would be ameliorated by the tax load being spread among the states in which the noncontingent beneficiaries were domiciled.

taxation in cases in which out-of-state trustees are selected, discriminates against interstate commerce by putting that commerce "into an inferior position to local commerce." We are not persuaded.

In our view, this assertion rests on an assumption about how Connecticut testators of testamentary trusts and settlors of inter vivos trusts are likely to select their trustees that rests on little more than speculation. First, as we indicated previously, although any resident trust would not be entitled to a credit for income taxes paid to another state based on the trust's income derived from intangibles, it would be entitled to such a credit for such taxes derived from real estate or tangible personal property. Thus, it is only the trust income derived from intangibles, not all potential trust income, that does not qualify for such a credit. Second, the purported testator or settlor also would have to be unwilling to admit of any significant degree of probability that the other taxing state would not provide, in *its* taxing scheme, a credit for taxes paid to Connecticut by the trust. Third, a testator or settlor sophisticated enough to envision the risk of future multiple taxation by a state of a nonresident trustee also would likely be sophisticated enough to realize that, even if a local bank originally was named as trustee, there would be no guarantee that the bank's trust operation would remain local, given the history of mergers and acquisitions in the financial services industry.

Thus, the plaintiff's position rests on the assumption that, despite all of these uncertainties, a Connecticut testator or settlor would choose a Connecticut bank, over an out-of-state bank, as trustee solely because of the potential for future multiple taxation of some portion of the trust's future income. The choice of bank as trustee is likely to be animated by many imponderables, among them: the prior experience of the testator or settlor; the financial performance of the various banks

in the pool of available choices; the current location of the likely beneficiaries; the current location of the various banks in the pool; and, of course, the tax implications, if any. We simply are not sufficiently persuaded of the underlying validity of the plaintiff's assumption about how such a multifaceted decision as the choice of a trustee is likely to be made.

The observations of the United States Supreme Court, in a recent case involving the application of the dormant commerce clause, are appropriate to the present case. In attempting to assess the likely effects of the regulatory scheme at issue there, the court stated: "The degree to which these very general suggestions might prove right or wrong, however, is not really significant; the point is simply that all of them are nothing more than suggestions, pointedly couched in terms of assumption or supposition. This is necessarily so, simply because the Court is institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them. . . . [S]ee Smith, State Discriminations Against Interstate Commerce, 74 Calif. L. Rev. 1203, 1211 (1986) (noting that '[e]ven expert economists' may have difficulty determining 'whether the overall economic benefits and burdens of a regulation favor local inhabitants against outsiders'). We are consequently ill qualified to develop Commerce Clause doctrine dependent on any such predictive judgments, and it behooves us to be . . . reticent about projecting the effect of applying the Commerce Clause here . . . ." (Citations omitted; internal quotation marks omitted.) *General Motors Corp.* v. *Tracy,* supra, 519 U.S. 308–309. Similarly, in the present case, we should be reticent about making predictions about the economic effects of the marginal incentives afforded by the state's taxing scheme of resident trusts. We conclude, therefore, that the incentives

and risks have not been sufficiently established so as to result in a dormant commerce clause violation.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and NORCOTT, PALMER and PETERS, Js., concurred.

MCDONALD, J., with whom BERDON, J., joins, dissenting. I disagree with the majority's conclusion that the imposition of Connecticut's state income tax on the entire income of the trusts does not violate due process of law or the commerce clause of the United States constitution. I would hold that Connecticut's attempt to tax the entire income, all of which was produced outside the state of Connecticut, violates both due process and the negative implications of the commerce clause.

"The Due Process and Commerce Clauses of the [United States] Constitution . . . prevent States that impose an income-based tax on nonresidents from tax[-ing] value earned outside [the taxing State's] borders." (Internal quotation marks omitted.) *Barclays Bank PLC* v. *Franchise Tax Board of California*, 512 U.S. 298, 303, 114 S. Ct. 2268, 129 L. Ed. 2d 244 (1994).

The due process clause "requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax . . . and that the income attributed to the State for tax purposes must be rationally related to values connected with the taxing State . . . ." (Citations omitted; internal quotation marks omitted.) *Quill Corp.* v. *North Dakota*, 504 U.S. 298, 306, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992). In establishing the minimum connection between Connecticut and these trusts, the majority focuses on the fact that the settlors of the trusts resided in Connecticut at the time the trusts were created, and that Connecticut offers some benefits and opportunities to the trusts.

The majority relies on the fact that the probate courts of this state "serve as the repository of the documents that define the beneficiaries' rights . . . give legal effect to those documents and oversee [the beneficiaries'] rights and interests . . . remain open and available to ensure that the beneficiaries' rights are being protected . . . [and are open for the] submission of accounts and any other matters of trust administration [which] gives the trustee the assurance that its administration of the trust will not be successfully challenged at a later time."

The majority, in sum, justifies a tax on the entire income of the trusts based on the fact that the Connecticut probate courts are open for accounting and trust administration. Our constitution[1] requires Connecticut courts to be open to all persons, including residents of other states or countries. The fact that the courts are open and available to nonresidents hardly would justify a Connecticut income tax on *all* of the income of New Yorkers or Canadians, simply because they may have a case within the subject matter jurisdiction of Connecticut courts.

While the trusts were indeed created in Connecticut under Connecticut law, all of the income has been realized in the state of New York. Therefore, none of the benefits cited by the majority is fiscally relevant, and Connecticut has done nothing in the years since the creation of the trusts to foster the economic environment in which the trust income has been produced. See *Wisconsin* v. *J. C. Penney Co.*, 311 U.S. 435, 444, 61 S. Ct. 246, 85 L. Ed. 267 (1940) (taxing power exerted by state must bear "fiscal relation to protection, opportunities and benefits given by the state"). As the Court

---

[1] The constitution of Connecticut, article first, § 10, provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

of Appeals of Michigan has stated: "We analogize the present case to a hypothetical statute authorizing that any person born in Michigan to resident parents is deemed a resident and taxable as such, no matter where they reside or earn their income. We believe this would be clearly outside the state's power to impose taxes." *Blue* v. *Dept. of Treasury*, 185 Mich. App. 406, 411, 462 N.W.2d 762 (1990). Following the majority of courts that have considered this issue, I would hold that Connecticut's attempt to tax the entire income of these trusts violates the fourteenth amendment due process clause of the United States constitution. See, e.g., id.; *In re Swift*, 727 S.W.2d 880, 882 (Mo. 1987); *Pennoyer* v. *Taxation Division Director*, 5 N.J. Tax 386, 399 (1983); *Mercantile-Safe Deposit & Trust Co.* v. *Murphy*, 15 N.Y.2d 579, 581, 203 N.E.2d 490, 255 N.Y.S.2d 96 (1964); *Taylor* v. *State Tax Commission*, 85 App. Div. 2d 821, 821–22, 445 N.Y.S.2d 648 (1981); see also *Augusta* v. *Kimball*, 91 Me. 605, 611, 40 A. 666 (1898). The majority claims that, in light of *Quill Corp.* v. *North Dakota*, supra, 504 U.S. 298, these earlier state decisions are no longer good law. *Quill Corp.*, however, concerned a North Dakota use tax on mail order purchases stored, used or consumed within North Dakota, and did not address the issue of taxing trust income based upon the settlor's residence.

I also disagree with the majority's conclusion that imposing Connecticut's state income tax upon the trusts does not violate the commerce clause. The majority dismisses as speculative the plaintiff's argument that the risk of multiple taxation of the trust income violates the commerce clause and its implicit prohibition against discrimination favoring intrastate commerce. The United States Supreme Court has clearly indicated that the risk, and not only the actuality, of multiple state taxation suffices to establish such a constitutional violation. See *Goldberg* v. *Sweet*, 488 U.S. 252, 261–62, 109

S. Ct. 582, 102 L. Ed. 2d 607 (1989); see also B. Bittker, Regulation of Interstate and Foreign Commerce (1999) § 8.07, p. 8-23; 1 J. Hellerstein & W. Hellerstein, State Taxation (3d Ed. 1998) ¶4.08 [1] [a], p. 4-39. To avoid the risk of multiple taxation, taxes that affect interstate commerce must be apportioned fairly between the states with potential jurisdiction to tax. *Goldberg* v. *Sweet,* supra, 260–61 ("the central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of an interstate transaction"); B. Bittker, supra, § 8.08, p. 8-26 (apportionment of taxed enterprise's global value among states claiming jurisdiction to tax is "a criterion of the constitutionality of state taxes"). In *Container Corp. of America* v. *Franchise Tax Board,* 463 U.S. 159, 103 S. Ct. 2933, 77 L. Ed. 2d 545 (1983), Justice Brennan, writing for the majority, stated: "The first, and . . . obvious, component of fairness in an apportionment formula is what might be called internal consistency—that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business' income being taxed. The second and more difficult requirement is what might be called external consistency—the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated." Id., 169.

The majority approves of imposing Connecticut's state income tax on the entire trust income even though New York or some other state might also tax that income. Connecticut's income tax is not apportioned at all and there is a risk of double taxation of the trust income. I believe that the lack of any apportionment of the tax liability between states with potential jurisdiction to tax these trusts is fatal to the Connecticut taxing scheme. Furthermore, the Connecticut scheme fails to provide the trusts with any credit for taxes paid to any other state. See, e.g., *Barringer* v. *Griffes,* 1 F.3d 1331,

1336 (2d Cir. 1993) (noting importance of credits in saving tax schemes from unconstitutionality). Without any provisions for apportionment or tax credits, the Connecticut income tax on these trusts lacks internal and external consistency and violates the negative implications of the commerce clause.

For the foregoing reasons, I respectfully dissent.